**DENTONS US LLP**
Melissa Sarsten Polito, Esq.
melissa.sarstenpolito@dentons.com
101 JFK Parkway, 4th Floor
Short Hills, New Jersey 07078
Tel: (973) 912-7162
Fax: (973) 912-7199

[and]

**DENTONS BINGHAM GREENEBAUM LLP**
Chelsea Granville Reed (*pro hac vice*)
chelsea.granvillereed@dentons.com
Kristin McCall (*pro hac vice*)
kristin.mccall@dentons.com
101 South Fifth Street, Suite 3500
Louisville, Kentucky 40202
Tel: (502) 589-4200
Fax: (502) 540-2169

*Attorneys for Plaintiff,*
*Atlantic City Linen Supply, LLC*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ATLANTIC CITY LINEN SUPPLY, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES SMALL BUSINESS ADMINISTRATION and KELLY LOEFFLER[1] in her official capacity as Administrator of the United States Small Business Administration<br><br>Defendants. | Civil Action No. 1:24-cv-10937 (ESK) (AMD)<br><br>**PLAINTIFF ATLANTIC CITY LINEN SUPPLY LLC'S RESPONSE IN OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

---

[1] SBA Administrator Kelly Loeffler has been automatically substituted for Isabella Casillas Guzman as a Defendant. *See* Fed. R. Civ. P. 25(d).

Plaintiff, Atlantic City Linen Supply, LLC ("AC Linen"), by and through counsel, and pursuant to the Administrative Procedure Act, Federal Rule of Civil Procedure 56, and Rule 56.1 of the Local Civil Rules for the District of New Jersey (the "Local Rules") submits this Response in Opposition to the Federal Defendants' Cross-Motion for Summary Judgment and Reply in Support of its Motion for Summary Judgment.

AC Linen believes that oral argument may assist the Court in adjudicating these issues. Thus, pursuant to Local Rule 78.1, AC Linen requests that oral argument be heard.

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

    I.     NAICS Code 721110 Reflects the Core of AC Linen's Business
         Operations. ...................................................................................................... 2

         A.     AC Linen's Revenue Documentation Supports NAICS Code 72. ............ 2

         B.     AC Linen's Tax Forms Support NAICS Code 72. ................................... 5

    II.    The CARES Act Does Not Delegate Unwavering Authority to the SBA in
         the Context of NAICS Codes ...................................................................... 6

         A.     Congressional Intent Behind the CARES Act Was Aimed at
               Eliminating the SBA's Traditionally Restrictive Eligibility and
               Review Criteria for the PPP. ...................................................................... 6

         B.     The CARES Act Does Not Delegate Authority to the SBA in the
               Context of NAICS Codes, and Any Ambiguities Therein Should
               Be Resolved in Favor of AC Linen ........................................................ 11

    III.   The Reasons Underpinning the FLRD are Unsupported, and Defendants
         Concede that the SBA Failed to Adequately Explain its FLRD Reasoning. ........ 14

CONCLUSION ....................................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*DV Diamond Club of Flint, LLC v. United States Small Bus. Admin.*,
    459 F. Supp. 3d 943 (E.D. Mich. 2020) ............................................................ *passim*

*Jama v. Immigr. & Customs Enf't*,
    543 U.S. 335 (2005) ................................................................................................. 2, 10

*Shop Rite, Inc. v. United States Small Bus. Admin.*,
    No. 25-30028, 2025 WL 3188380 (5th Cir. 2025) ................................................... 7

*DV Diamond Club of Flint, LLC v. United States Small Bus. Admin.*,
    960 F.3d 743 (6th Cir. 2020) ............................................................................. 7, 8, 9

*Nat'l Ass'n of Home Builders v. United States Small Bus. Admin.*,
    No. 20-11780, 2021 WL 4458660 (E.D. Mich. 2021) ........................................... 7, 9

*Nat'l Ass'n of Home Builders v. United States Small Bus. Admin.*,
    No. 21-1765, 2023 WL 192239 (6th Cir. 2023) ....................................................... 9

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC*,
    718 F.3d 1006 (9th Cir. 2013) ................................................................................ 10

*Palladian Partners, Inc. v. United States*,
    783 F.3d 1243 (Fed. Cir. 2015) ............................................................................... 10

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ............................................................................................ 11, 12

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ............................................................................................ 11, 12

*Lomax v. Ortiz-Marquez*,
    140 S. Ct. 1721 (2020) ............................................................................................ 13

*Lupyan v. Corinthian Colleges Inc.*,
    761 F.3d 314 (3d Cir. 2014) .............................................................................. 14, 15

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
    560 F.3d 156 (3d Cir. 2009) .............................................................................. 14, 15

*Paladino v. Newsome*,
    885 F.3d 203 (3d Cir. 2018) ................................................................................... 15

*Waldron v. SL Indus., Inc.*,
    56 F.3d 491 (3d Cir. 1995) ..................................................................................... 15

iv

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................................................15

*Payne v. Pauley*,
    337 F.3d 767 (7th Cir. 2003) .........................................................................................15

*Collins v. Esper*,
    No. 16-CV-11702-IT, 2018 WL 1399299 (D. Mass. 2018) ...........................................16

*TQ Delta, LLC v. CISCO Sys., Inc.*,
    942 F.3d 1352 (Fed. Cir. 2019).....................................................................................16

*Dimter v. Comm'r Soc. Sec.*,
    No. 24-1350, 2024 WL 4986935 (3d Cir. Dec. 5, 2024)...............................................16

*Das v. Comm'r Soc. Sec.*,
    No. 22-3229, 2023 WL 6157395 (3d Cir. 2023) ...........................................................16

*Sisco v. Comm'r Soc. Sec.*,
    840 F. App'x 685 (3d Cir. 2020) ...................................................................................16

*Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Hum. Servs.*,
    730 F.3d 291 (3d Cir. 2013)......................................................................................17, 18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..........................................................................................17, 19, 20

*Mass. v. Nat'l Insts. of Health*,
    770 F. Supp. 3d 277 (D. Mass. 2025) ............................................................................18

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
    37 F.4th 746 (1st Cir. 2022)......................................................................................18, 19

*Nat'l Tr. for Historic Pres. v. Buttigieg*,
    125 F.4th 278 (1st Cir. 2025)..........................................................................................19

*Gailius v. I.N.S.*,
    147 F.3d 34 (1st Cir. 1998).............................................................................................19

**Statutes**

15 U.S.C. § 636...............................................................................................................8, 9

v

**Regulations**

13 C.F.R. § 121.107 ....................................................................................................7, 13

13 CFR § 120.110 ........................................................................................................8, 9

13 C.F.R. 121.402 ..........................................................................................................10

13 C.F.R. § 121.201 .......................................................................................................13

85 Fed. Reg. 10803 ........................................................................................................13

**Other Authorities**

UNITED STATES CENSUS BUREAU, North American Industry Classification System ............ *passim*

**INTRODUCTION**

The coronavirus pandemic devastated the United States economy — forcing widespread business closures, massive layoffs, and plunging the economy into a sharp recession nearly overnight. Businesses in certain industries, including hospitality and tourism, experienced devastatingly sharp revenue declines and threats of widespread unemployment. AC Linen was no different. The pandemic destroyed AC Linen's income stream, demonstrated by a significant drop in gross receipts from 2019 to 2020 of nearly ninety-nine percent (99%). *See* Local Civil Rule 56.1 Supplemental Statement of Undisputed Material Facts ("Rule 56.1 Statement") at ¶ 1. AC Linen applied for and received Paycheck Protection Program ("PPP") loan proceeds to keep 190 of its workers employed based on the broad congressional pronouncement that any business designated as a NAICS Code 72 entity was eligible for a loan without regard to the SBA's traditional 7(a) Loan Program affiliation restrictions. AC Linen did so because it is properly classified as a NAICS Code 72 entity.

Hotels cannot function without the linen management services at the core of AC Linen's business operations. In line with the Census Bureau description of NAICS Code 721110, AC Linen provides the linen management services essential to a hotel's operational infrastructure. Without reviewing and tracking linen inventory, advice regarding par levels, purchase, and replacement, linen quality consultation, and constant monitoring of linen to prevent losses and quality issues, hotels *could not* operate — as they would inevitably be faced with serious health and safety concerns, reputational damage, and a corresponding decrease in guest stays and revenue.

The Brief in Support of Federal Defendants' Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment [Dkt. 46-1] (the "Cross-Motion") unquestionably misses the mark in grasping the statutory context underpinning the congressional pronouncement to expand the PPP to businesses (like AC Linen) hardest hit by the pandemic. In

passing the CARES Act, Congress specifically intended to relax traditional 7(a) Loan Program requirements to prevent the SBA from imposing its restrictive review processes and procedures on PPP participants. *See DV Diamond Club of Flint, LLC v. United States Small Bus. Admin.*, 459 F. Supp. 3d 943, 958 (E.D. Mich. 2020) (stating that "Congress did not want the SBA's existing eligibility limitations to be imported wholesale into the PPP."). Congress could have, but did not, expressly state that the SBA should apply its internal processes to review NAICS Code 72 designations. *See Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply"). Yet, even if the SBA was permitted to engage in a review of AC Linen's NAICS Code for eligibility purposes, it cannot disregard substantive proof supporting a NAICS Code 72 designation based on a subjective (and incorrect) view of AC Linen's business model. In doing so, the SBA violated the APA. Accordingly, and as set forth more fully below, this Court should vacate the SBA's decision to deny forgiveness of AC Linen's Second Draw PPP Loan.

## ARGUMENT

### I.    NAICS Code 721110 Reflects the Core of AC Linen's Business Operations.

#### A.    *AC Linen's Revenue Documentation Supports NAICS Code 72.*

The NAICS Code Manual provides that entities primarily engaged in hotel management services (i.e., providing management and operating staff to run hotels) may identify themselves using NAICS Code 721110. Not only that, but the NAICS Code Manual further provides that NAICS Code 721110 establishments "may offer food and beverage services, recreational services, conference rooms, convention services, laundry services, parking, and other services," thereby recognizing that laundry services are indeed a key component of hotel management operations.[2]

---

[2] *See* United States Census Bureau, North American Industry Classification System, *available at* https://www.census.gov/naics/?input=72&chart=2017&details=721.

Given that NAICS Code 721110 recognizes that laundry services are essential to hotel operations, linen management services for hotels falls squarely within 721110.

Furthermore, the NAICS standard classifies businesses based on their ***primary business activity*** and most relevant here, the United States Census Bureau "generally uses revenue or value of shipments to determine an establishment's primary business activity."[3] For purposes of this appeal, it is the assessment of AC Linen's revenue stream that matters, and in determining the appropriate NAICS Code assignment, the Census Bureau commands that it reflect "the activity that generates the most revenue for the establishment."[4] In 2019, AC Linen derived one hundred percent (100%) of its revenue directly from its hotel linen management services. *See* Rule 56.1 Statement at ¶ 2. Stated differently, because AC Linen's revenue stream and economic viability is ***entirely dependent*** on its hotel linen management services, AC Linen is an integral part of the accommodation industry. As discussed in the DiDonna Memorandum, the "2019 P&L [S]tatement — although reflective that th[e] majority of AC Linen's revenue was from hotel clients — does not tell the whole story." *See* Rule 56.1 Statement at ¶ 3. A detailed description of AC Linen's revenue breakdown can be found in the AR via statements from individuals like David Kimmel, the Chief Financial Officer for AC Linen. The Kimmel Statement notes that the "2019 P&L . . . do[es] not fully reflect certain important aspects of [AC Linen's] business operations." *See* Rule 56.1 Statement at ¶ 4. He continues, "[s]pecifically, the 2019 P&L does not identify, e.g., the amount of revenue attributable to consultation and/or management services provided to hotel clients in connection with linen services." *See* Rule 56.1 Statement at ¶ 5.  As Kimmel notes, AC Linen's business model involves management and consulting services for hotels, which allow it to

---

[3] *See* UNITED STATES CENSUS BUREAU, North American Industry Classification System, at FAQ No. 4, *available at* https://www.census.gov/naics/#q1.
[4] *See id*., at FAQ No. 10.

"function[] as the laundry and linen management department for the hotels" and is the primary reason it applied for a PPP loan with the NAICS Code 72 identifier. *See* Rule 56.1 Statement at ¶ 6. All of AC Linen's "revenue is derived from hotel accounts" secured "based on the unique, hotel-specific knowledge/expertise" in linen management and consultation. *See* Rule 56.1 Statement at ¶ 7. These correspondences and statements illustrate that laundering (i.e., cleaning, washing, drying, and ironing linens) is not the primary source of AC Linen's revenue — it is the management of hotel linen and laundry operations.

Indeed, AC Linen's hotel-specific expertise is exactly what sets it apart from the traditional commercial launderer identified by NAICS Code 81. AC Linen integrates its staff into hotel operations and performs a host of management functions including:

- A review of a hotels' existing linen inventory to understand budgetary limits and guest expectations;

- Advisements regarding adjustments to linen par levels, purchase, and labor needed to maintain prospective linen purchase;

- Consultation regarding linen quality, thread count, luxuriousness, stain resistance, weight, material blends, lifespan and care;

- Assistance with developing linen replacement budgets;

- Monitoring and recording linen losses, removing old and damaged linens.

*See* Rule 56.1 Statement at ¶ 8. Because AC Linen is responsible for a hotel's linen management, it stands to reason that the company is integral to the overall hotel operations  necessary to conduct business. *See* Rule 56.1 Statement at ¶ 9. Serving as the laundry and linen management department for hotels, AC Linen's business operations precisely fit the phrase "hotel management services" and provision of management and staff necessary to run a hotel as defined by NAICS 72. *See* NAICS Code 721110 ("The establishments in [the hotel and motel] industry may offer food and

4

beverage services, recreational services, conference rooms, convention services, **laundry services**, parking, and other services." (emphasis added)).[5]

Ultimately, linen management is a core function for hotels, and because AC Linen's linen management services are vertically integrated into a hotel's internal processes, its services are operationally indistinguishable from a hotel-owned department that manages and oversees its own linens. Put simply, AC Linen is not a generic laundry service provider — it is primarily a hotel linen and laundry management company. NAICS Code 72 best represents its primary economic activity.

### B.    AC Linen's Tax Forms Support NAICS Code 72.

NAICS Code selections are rooted in tax reporting structures. Critically, given that AC Linen's revenue stream is directly tied to hotel linen management necessary to operate hotels, its tax structure must unquestionably support a NAICS 72 designation – and it does in this case. AC Linen is a single member limited liability company ("LLC") wholly owned by AMCP Clean Subsidiary Holdco LLC ("AMCP") and therefore, is disregarded as an entity separate from AMCP. *See* Rule 56.1 Statement at ¶ 10; *see also* DN 46-3, Defendants' Response to Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts (the "Response to SOMF"), ¶¶ 17-18, 21 (admitting that AC Linen's income and expenses are reported on AMCP's tax returns, and that AMCP selected NAICS Code 72 on its 2019 and 2020 IRS Form 1065s). During the relevant time, the activities of AC Linen were reported on the federal income tax returns of AMCP. *See* Rule 56.1 Statement at ¶ 11. AMCP previously selected NAICS Code 812320 on its 2018 U.S. Return of Partnership Income Form 1065 and the following year, changed the NAICS Code on its tax returns – indicative of the recognition that NAICS Code 72 more accurately reflected its business

---

[5] *See* UNITED STATES CENSUS BUREAU, North American Industry Classification System, *available at* https://www.census.gov/naics/?input=72&chart=2017&details=721.

operations focusing on management services. *See* Rule 56.1 Statement at ¶ 12.

The SBA's own PPP borrower application form explicitly directed borrowers to refer to tax returns when determining NAICS Codes for purposes of the affiliation waiver. Indeed, on AC Linen's Second Draw Loan Application, the SBA directed it to refer to its tax returns to determine the appropriate NAICS Code:

> For purposes of reporting NAICS Code, applicants must match the business activity code provided **on their IRS income tax filings**, if applicable.

*See* Rule 56.1 Statement at ¶ 13 (emphasis added). Through such guidance, the SBA has specifically acknowledged that AC Linen's NAICS Code can be determined by referring to its tax returns. As a single member LLC wholly owned by AMCP, AC Linen's revenue and expenses are reported on AMCP's tax return. Because of this tax reporting structure, AC Linen's activities and revenue are treated as part of AMCP's NAICS Code 72 operations. Thus, because the SBA's *own guidance* instructs PPP borrowers to use the NAICS Code identified on their tax returns, AC Linen's NAICS Code is appropriately designated as 72.

## II.     The CARES Act Does Not Delegate Unwavering Authority to the SBA in the Context of NAICS Codes.

### A.     *Congressional Intent Behind the CARES Act Was Aimed at Eliminating the SBA's Traditionally Restrictive Eligibility and Review Criteria for the PPP.*

Here, because the SBA instructs PPP borrowers to use the NAICS Code identified on their tax returns (and because the Internal Revenue Service requires taxpayers to self-select that code), the SBA is ultimately relying on AC Linen's self-selected NAICS Code. Defendants, however, disagree with the notion that NAICS Codes are self-assigned. Instead, they argue that the SBA has the authority to assign NAICS Codes to borrowers under the PPP utilizing its primary industry methodology and in doing so, question the relevance of Census Bureau guidance relating to NAICS Code designations. *See* Cross-Motion, at 20, 24 (stating that "it is unclear whether the

Census Bureau's FAQs have any relevance to SBA's assignment of NAICS [C]odes . . . . ").[6] Defendants' position in this respect is disingenuous at best, especially in light of the fact that the SBA's self-drafted Affiliation Worksheet directed borrowers to the Census Bureau website for directions regarding selection of NAICS Codes for purposes of PPP eligibility, including NAICS Code 72, to assist in determining their self-assignment. *See* Rule 56.1 Statement at ¶ 14.

The fact remains, nothing within the CARES Act or Economic Aid Act expressly authorizes the SBA to second-guess or review a borrower's self-assigned NAICS Code, and despite Defendants' attempt to retroactively read in discretionary authority for SBA to assign NAICS Codes to borrowers, *see* Cross-Motion, at 22, there exists no separate set of regulations pertaining to NAICS Codes within the 7(a) Loan Program context. And while some courts outside this jurisdiction have determined that this "statutory silence" permitted the SBA to "rel[y] on its clearly granted authority to administer the PPP loan program under the Section 7(a) loan eligibility framework" and utilize 13 C.F.R. § 121.107 to review the accuracy of a borrower's NAICS Code, *see, e.g., Shop Rite, Inc. v. United States Small Bus. Admin*., No. 25-30028, 2025 WL 3188380, at *4 (5th Cir. Nov. 14, 2025), others have adopted a differing view of the issue — instead finding that the congressional decision to relax loan requirements was specifically intended to prevent the SBA from imposing its own internal terms, conditions, and processes traditionally applicable to Section 7(a) loans. *See DV Diamond Club of Flint, LLC v. United States Small Bus. Admin*., 960 F.3d 743 (6th Cir. 2020); *Nat'l Ass'n of Home Builders v. United States Small Bus. Admin*., No. 20-11780, 2021 WL 4458660 (E.D. Mich. 2021); *DV Diamond Club of Flint*, 459 F. Supp. 3d 943.

---

[6] Defendants also claim that AC Linen "selective[ly] quot[ed] the Census Bureau FAQs by failing to acknowledge that FAQ 10 states that "[i]ndividual establishments are assigned NAICS codes by various agencies for various purposes using a variety of methods." *See* Cross-Motion, at 23 (citing UNITED STATES CENSUS BUREAU, North American Industry Classification System, at FAQ No. 10, *available at* https://www.census.gov/naics/#q10). While certain agencies may assign NAICS Codes, the PPP framework did not allow for such assignment. As outlined above, PPP guidance points borrowers to their tax forms and Census Bureau guidance for NAICS Code self-selection. Furthermore, there is no framework in the PPP for the SBA to assign NAICS Codes to borrowers.

For instance, in *DV Diamond Club of Flint, LLC v. United States Small Business Administration*, plaintiffs, described as "sexually oriented businesses," sought injunctive relief to bar the SBA from enforcing an interim final rule which imposed eligibility restrictions beyond what the CARES Act intended. 459 F. Supp. 3d at 949. The interim final rule, implemented by the SBA following enactment of the CARES Act, prohibited sexually oriented businesses from receiving PPP loans as required by the SBA's traditionally imposed exclusions in 13 CFR § 120.110. *Id*. The court granted injunctive relief, finding that the SBA improperly applied its internal rules to prohibit plaintiffs from receiving PPP loans. *Id*. at 958. In granting such relief, the court found that the "context in which Congress enacted the PPP further confirm[ed] the Court's reading of the PPP loan guarantee eligibility provisions" because:

> Congress is "presumed to [have been] aware of" the Original SBA Ineligibility Rule and the 2019 SOP[7] "when it passe[d]" the PPP . . . Congress nonetheless provided in the PPP that "any business concern . . . shall be eligible" for a loan guarantee if it employed the requisite number of Americans during the covered period. 15 U.S.C. § 636(a)(36)(D)(i) (emphasis added). That is a clear indication that Congress did not want the SBA's existing eligibility limitations to be imported wholesale into the PPP. Indeed, if Congress had intended to permit the SBA to apply its existing eligibility limitations, Congress could easily have provided that "any otherwise eligible business concern" employing the requisite number of Americans during the covered period would be eligible for a PPP loan. It did not. This confirms that the SBA may not apply to the PPP its historical limitation against supporting businesses of a "prurient sexual nature."

*Id*. at 958. The Sixth Circuit Court of Appeals validated the trial court's decision in denying the SBA's motion for a stay. *See DV Diamond Club of Flint*, 960 F.3d at 747 ("by specifying 'any business concern,' Congress made clear that the SBA's longstanding ineligibility rules are inapplicable . . . . ").

---

[7] The Original SBA Ineligibility Rule, codified at 13 C.F.R. § 120.110, is a 1996 rule created by the SBA which declares certain businesses ineligible to participate in SBA lending programs, such as banks, life insurance companies, and sexually oriented businesses. *See DV Diamond Club of Flint*, 459 F. Supp. at 947. These ineligibility restrictions are reiterated in the SBA's 2019 Standard Operating Procedure publication.

Likewise, in *National Association of Home Builders v. United States Small Business Administration*, the Eastern District of Michigan found that the SBA exceeded its statutory authority under the CARES Act by unilaterally applying the SBA's long-standing "passive business exclusion" to home builders and real estate developers. 2021 WL 4458660, at *11 (vacated and remanded sub nom. on other grounds *Nat'l Ass'n of Home Builders v. United States Small Bus. Admin.*, No. 21-1765, 2023 WL 192239 (6th Cir. 2023)). In that case, plaintiffs brought suit against the SBA under the APA, arguing that, *inter alia*, the SBA's decision to implement an interim final rule excluding their participation in the PPP was an "agency interpretation contrary to law under the CARES Act . . . . " *Id.* at *3. The court agreed, and in doing so, rejected defendants' assertion that it "should defer to their interpretation of the statute" and allow it to enact eligibility rules consistent with conventional section 7(a) loan requirements. *Id.* at *7-12. Instead, the court reiterated its interpretation that the SBA was to extend PPP loans to any business irrespective of its traditional rules — and unilateral application of exclusions set forth in 13 C.F.R. § 120.110 exceeded its statutory authority. *Id.* at *9, 11-12.[8]

The principles set forth in the aforementioned cases illustrate two points critical to this appeal. First, these cases support an expansive reading of 15 U.S.C. § 636(a)(36)(D) based on the understanding that Congress intended PPP loan eligibility to include a broad swath of businesses. 15 U.S.C. § 636(a)(36)(D). Second, building upon that principle, though the PPP was added to the 7(a) Loan Program framework, Congress's intentional omission of any qualifying language, distinction, or limitation in connection with NAICS Code designation review in 15 U.S.C. § 636(a)(36)(D) demonstrates that it did not intend for the SBA to unilaterally implement its own

---

[8] Defendants appealed to the Sixth Circuit, but the appeal was vacated as moot by agreement of the parties after plaintiffs received First Draw PPP Loans and loan forgiveness. In agreeing to dismiss the appeal, the SBA stated that it had "no intention of seeking repayment from [plaintiffs'] members in the future based on business-type ineligibility." *Nat'l Ass'n of Home Builders*, 2023 WL 192239, at *1.

9

lending restrictions or for the SBA to utilize its own primary industry methodology to limit participation by reassessing NAICS Codes, as Defendants suggest. *See* Cross-Motion, at 21 (stating that AC Linen fails to identify a statutory provision prohibiting the SBA from second-guessing NAICS Codes). Congress could have stated that the SBA should apply its internal review procedures, or more specifically, granted it authority to review NAICS Code 72 designations. *See Jama*, 543 U.S. at 341 ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply"). Congress did not include any such limitation. Instead, Congress chose to expressly expand eligibility to businesses with NAICS Code 72 designations without qualification. *See*, *e.g.*, *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1020 (9th Cir. 2013) ("Had Congress intended to include such a limitation, it would have said so expressly and unambiguously . . . .").

Furthermore, Congress had an arsenal of options at its disposal with respect to implementing a NAICS Code review process if it had wanted to do so. Indeed, the SBA has an extensive regulatory process for NAICS Code designations and review of same in the context of government procurement and contracting. As summarized by the Federal Circuit in *Palladian Partners, Inc. v. United States*, in the government procurement context, the SBA regulations explicitly provide for the assignment of NAICS Codes by procuring officers and appeals of NAICS Code determinations to the Office of Hearings and Appeals ("OHA"):

> SBA's regulations instruct that the procuring agency's contracting officer "designates the proper NAICS code and corresponding size standard in a solicitation, selecting the single NAICS code which best describes the principal purpose of the product or service being acquired." 13 C.F.R. 121.402(b). The NAICS code assigned to a solicitation limits the small businesses that may submit bids to those that qualify under the size standard associated with that particular NAICS code. By regulation, the contracting officer's choice of NAICS code and corresponding size standard is "final unless timely appealed" to SBA's OHA. 13 C.F.R. 121.402(d).

10

783 F.3d 1243, 1247 (Fed. Cir. 2015). The aforementioned SBA regulations concerning appeals of NAICS Code designations make no specific references to Section 7(a) loan determinations, nor do the regulations incorporate same. The presence of a specific NAICS code designation process for government procurement, and the deliberate omission of such a process for Section 7(a) loans makes clear that the SBA lacks the regulatory authority to reassess a party's self-designated NAICS Code in the context of the PPP.

### B. The CARES Act Does Not Delegate Authority to the SBA in the Context of NAICS Codes, and Any Ambiguities Therein Should Be Resolved in Favor of AC Linen.

In *Loper Bright Enters. v. Raimondo*, the United States Supreme Court directly addressed the deference a federal court is required to give agency interpretations of provisions in administrative statutes. 603 U.S. 369 (2024). Prior to the *Loper Bright* decision, federal courts followed precedent established by *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), wherein a federal court deferred to an agency's "reasonable" interpretation of the statute it administers if the statute was ambiguous rather than engaging in its own construction using traditional tools of statutory interpretation. 467 U.S. at 842-43. *Chevron* also recognized that congressional intent to set forth "an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," required "[s]uch legislative regulations [to be] given controlling weight unless they [we]re arbitrary, capricious, or manifestly contrary to the statute." *Id*. at 843-44.

The Supreme Court's decision in *Loper Bright* overruled *Chevron*, describing its presumption as "misguided because agencies have no special competence in resolving statutory ambiguities." 603 U.S. at 400-01. Rather, the Court determined that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," regardless of whether the statute is ambiguous. *Id*. at 412. As such, the "courts decide legal

11

questions" concerning the statutes that federal agencies administer. *Id*. at 392, 399-401. As applicable to this case, the Court stated:

> Once more, the basic nature and meaning of a statute does not change when an agency happens to be involved. Nor does it change just because the agency has happened to offer its interpretation through the sort of procedures necessary to obtain deference, or because the other preconditions for *Chevron* happen to be satisfied. . . .
>
> *Chevron* is overruled. Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires. Careful attention to the judgment of the Executive Branch may help inform that inquiry. And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it. But courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous.

*Id*. at 408, 412-13. In doing so, the Supreme Court's recent ruling in *Loper Bright* advises that "[a]gency interpretations of statutes — like agency interpretations of the Constitution — are *not* entitled to deference." *Id*. at 392 (emphasis in original).

Here, there is nothing in the CARES Act that authorizes the SBA to review and reassign NAICS Codes. The language mandates the opposite: the SBA is to lend PPP loans to businesses designated with NAICS Code 72, and in doing so, waive the affiliation rules. Defendants' attempt to read in discretionary authority to assess and reject a borrower's self-assigned NAICS Code is in direct contravention with this language and likewise, forces an interpretation in excess of the SBA's statutory authority. Reading the CARES Act in any other way is to acknowledge an ambiguity in the language that does not exist.

And yet, even if there were an ambiguity, Defendants' theory that Congress delegated to the SBA unfettered discretion to apply any review-related criteria it deemed fit is not entitled to deference. *See Loper Bright*, 603 U.S. at 395 (stating that "the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress

subject to constitutional limits."). Defendants' position is in direct contradiction with the framework established by the CARES Act, and it alters the meaning of the CARES Act to assume Congress intended to permit the SBA to unilaterally impose PPP eligibility review criteria in this way. *See Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020) (courts should not alter a statute's meaning "by inserting words Congress chose to omit").

Moreover, even assuming the CARES Act permits the SBA to apply the same "terms, conditions, and processes" as applicable to Section 7(a) loans, there are no "terms, conditions, and processes" within the Section 7(a) framework to reassess NAICS Code designations. Recognizing that the CARES Act does not include a provision authorizing the SBA to review NAICS Code 72 designations, Defendants instead argue that the SBA's authority to do so is derived from its existing size eligibility restrictions set forth in 13 C.F.R. part 121, and more specifically, 13 C.F.R. § 121.201, 107. *See* Cross-Motion, 18-19. Yet, this interpretation fails to account for the exception the CARES Act created for NAICS Code designated entities. In other words, even if the SBA's existing size-standard framework applied, those rules do not apply where the CARES Act created an exception. The SBA's Standard Operating Procedures (which do not have the force and effect of law)[9] and regulatory provision set forth in 13 C.F.R. § 121.107 are precisely the types of rules the SBA was prohibited from utilizing in the context of the PPP because application of these guidelines directly contradicted the congressional decision to open the PPP to business concerns irrespective of SBA's traditional 7(a) Loan Program parameters. *See DV Diamond Club of Flint*, 459 F. Supp. 3d at 965 (ordering that plaintiffs shall not be denied PPP loans based on the SBA's

---

[9] The SBA has affirmed its understanding that a guidance document does not have the force and effect of law. *See* 85 FR 10803 (Feb. 25, 2020) (stating that "'guidance documents' are defined as any statement of agency policy or interpretation concerning a statute, regulation, or technical matter within the jurisdiction of the agency that is intended to have general applicability and future effect, but which *is not intended to have the force or effect of law* in its own. For the SBA, 'guidance documents' includes externally facing Standard Operating Procedures, Policy Notices, Procedural Notices, and some miscellaneous documents, such as certain Program Guides, and other general guidance.") (emphasis added).

13

self-implemented ineligibility rules, as such rules were applied in contravention of the CARES Act). This Court should reject Defendants' assertion that the SBA's ability to assess size standards necessarily encompasses the right to reassess self-designated NAICS Codes given that there is no separate regulation pertaining to NAICS Codes or review of same in the Section 7(a) context.

### III.    The Reasons Underpinning the FLRD are Unsupported, and Defendants Concede that the SBA Failed to Adequately Explain its FLRD Reasoning.

Defendants' surface level engagement with evidentiary support for the alignment of AC Linen's business model and the Corresponding Index Entry for hotel management services identified by NAICS Code 721110 is indicative of its unfamiliarity with the nuances of AC Linen's business.[10] Defendants' Cross-Motion is devoid of any discussion of AC Linen's tax reporting structure, all of which plainly supports a finding that its primary business activity is consistent with a NAICS Code 72 designation. *See* DN 46-3, Response to SOMF, ¶¶ 17-18, 21 (admitting that AC Linen's income and expenses are reported on AMCP's tax returns, and that AMCP selected NAICS Code 72 on its 2019 and 2020 IRS Forms 1065s). Not only that, but Defendants cast aside the statements produced alongside AC Linen's revenue and tax documentation which support a NAICS Code 72 designation as "self-serving" and cursorily conclude that the SBA's decision was reasonable. This argument ignores the content of the DiDonna, Kimmel, and Noble statements, all of which provide a broader explanation of information already contained in the AR from their personal knowledge.

"[A] single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment." *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 320-21 (3d Cir. 2014) (citing *Kirleis v. Dickie, McCamey*

---

[10]*See* UNITED STATES CENSUS BUREAU, North American Industry Classification System, 2017 NAICS Definition, *available at* https://www.census.gov/naics/?input=72&chart=2017&details=721110.

& *Chilcote, P.C.*, 560 F.3d 156, 161-63 (3d Cir. 2009)). "This remains true even if the affidavit is 'self-serving.'" *Id.* "Indeed, the testimony of a litigant will almost always be self-serving since few litigants will knowingly volunteer statements that are prejudicial to their case. However, that has never meant that a litigant's evidence must be categorically rejected by the fact finder." *Lupyan*, 761 F.3d at 321 n. 2; *see also Kirleis*, 560 F.3d at 161 (rejecting the argument that a "self-serving" affidavit should be rejected as conclusory because the content included details sufficiently specific and uncontested by the opposing party). Indeed, "a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment." *Paladino v. Newsome*, 885 F.3d 203, 209 (3d Cir. 2018); *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 501 (3d Cir. 1995) (stating that "the Supreme Court has made it clear that self-serving testimony may be utilized by a party at summary judgment") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *see also Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (stating that an affidavit can defeat summary judgment where it "meets the usual requirements for evidence presented on summary judgment — including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial — a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts."). Here, the information contained in the DiDonna, Kimmel, and Noble statements include specific and materially compelling facts within their personal knowledge. The content therein provides support for *why* AC Linen selected NAICS Code 72, as well as *how* they gained credible, personal knowledge of the company's unique business operations. Defendants have produced no evidentiary support to rebut the assertion that its unique, hotel-specific expertise and services offerings in management services are more accurately described using NAICS Code 72. *See* DN 46-3, Response to SOMF), ¶¶ 23-26.

Alongside the DiDonna, Kimmel, and Noble statements is an objective, unqualified attorney legal opinion memorialized in writing from a prominent Washington, DC law firm specializing in congressional regulatory interpretation – the Brownstein Legal Opinion. *See* Rule 56.1 Statement at ¶ 15. The Brownstein Legal Opinion pre-dates AC Linen's application for a Second Draw Loan and includes a detailed explanation of AC Linen's business model. It states that the historical designation "does not reflect its business model or actual business operations." *See* Rule 56.1 Statement at ¶ 16. Not only that, but after assessing the nature of AC Linen's current business operations, the Brownstein Legal Opinion concludes that it is appropriate for AC Linen[11] to utilize NAICS Code 72 given that its business model, operations, and revenue are derived from its laundry and linen management services. *See* Rule 56.1 Statement at ¶ 17. This opinion, coupled with AC Linen's revenue information, tax documentation, and the statements supporting them illustrate the unreasonably arbitrary and capricious nature of the SBA's decision to reject AC Linen's NAICS Code 72 designation. *See, e.g., Collins v. Esper*, No. 16-CV-11702-IT, 2018 WL 1399299, at *8 (D. Mass. 2018) (granting in part plaintiff's motion for judgment and ordering remand where military determined cadet committed misconduct without sufficient evidentiary support in the existing administrative record); *TQ Delta, LLC v. CISCO Sys., In*c., 942 F.3d 1352, 1357-63 (Fed. Cir. 2019) (reversing Patent Trial and Appeal Board's ("PTAB") determination that invention was obvious despite evidentiary support because expert testimony that the PTAB relied on was too conclusory and unspecific to constitute substantial evidence).[12]

---

[11] The Brownstein Legal Opinion states that references to "PureStar" refers to AMCP and its operating subsidiaries, which includes AC Linen. *See* Rule 56.1 Statement at ¶ 21. The Brownstein Legal Opinion concludes that the operating companies of PureStar may appropriately utilize NAICS 72 in applying for PPP loans. *See* Rule 56.1 Statement at ¶ 22.

[12] Defendants cite to opinions addressing substantive evidence in the context of social security disability proceeding appeals, rather than appeals under the APA – all of which are factually inapposite to this case: *Dimter v. Comm'r Soc. Sec.*, No. 24-1350, 2024 WL 4986935 (3d Cir. 2024); *Das v. Comm'r Soc. Sec.*, No. 22-3229, 2023 WL 6157395 (3d Cir. 2023); *Sisco v. Comm'r Soc. Sec.*, 840 F. App'x 685 (3d Cir. 2020).

16

Even if the SBA was permitted to engage in a review of AC Linen's NAICS Code for eligibility purposes, it still must do so in compliance with the APA. It cannot disregard substantive proof supporting a NAICS Code 72 designation and re-designate AC Linen's NAICS Code based on an incorrect view of AC Linen's business model. The FLRD concludes that AC Linen is not eligible for "a NAICS 72 wa[iv]er because [it is] not a hotel or restaurant." Rule 56.1 Statement at ¶ 18. In so finding, the correspondence indicates that its reasoning is based on a finding that "99% of income is derived from cleaning," and that its revenue-related documentation includes no descriptors for "Room" or "Food & Beverage" categories or "Hotel management" or "Hotel Employees" that would align with businesses designated with NAICS Code 72. Rule 56.1 Statement at ¶ 19. Yet, the SBA fails to recognize that businesses can provide hotel management services without offering food, beverage, accommodations, or lodging and be properly identified using NAICS Code 72. Furthermore, the SBA ignores the Brownstein Legal Opinion and Kimmel Statement accompanying it which explain that the 2019 P&L "does not fully reflect certain important aspects of [AC Linen's] business operations," such as the revenue attributable to linen consultation and/or management services.[13] *See* Rule 56.1 Statement at ¶ 20; *see also* DN 46-3, Response to SOMF), ¶¶ 25-26; *see Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Hum. Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) (citing M*otor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (stating that agency action "may be arbitrary and capricious" if the agency "offered an explanation for its decision that runs counter to the evidence before the agency . . . . "). Conclusory statements in a FLRD such as this are

---

[13] Defendants assert that "there is nothing in the record to suggest that [AC Linen's] business changed in any meaningful way over the years, or certainly by the time it submitted its 2019 profit and loss statement." *See* Cross-Motion, at 28. This argument is directly contradicted by the Brownstein Legal Opinion, an opinion authored by an attorney that investigated the nature of AC Linen's business operations and determined that it was appropriate for it to apply for the PPP using NAICS Code 72. Indeed, the Brownstein Legal Opinion includes a detailed explanation of AC Linen's business model and states that the historical designation "does not reflect its business model or actual business operations." *See* Rule 56.1 Statement at ¶ 23.

17

undeniably arbitrary because they are devoid of the reasoning or explanation necessary to establish a rational connection between the SBA's factual findings and the loan forgiveness denial decision. *See Mass. v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 305 (D. Mass. 2025) (citations omitted) ("[C]onclusory statements will not do; an agency's statement must be one of reasoning."). Not only that, but the SBA's proffered reasoning — that AC Linen is not a "hotel or restaurant" — fails to grapple with the facts showing that AC Linen is properly designated as a NAICS Code 72 entity because it provides **hotel management services**. Clearly then, the SBA's failure to assess "relevant factors or pertinent aspects of the problem" illustrates that it cannot "demonstrate a rational connection between the facts and choice that was made." *Id.* at 306 (concluding plaintiffs likely to succeed on motion for preliminary injunction where defendant's reasoning "fail[s] to grapple with the relevant factors or pertinent aspects of the problem and fails to demonstrate a rational connection between the facts and choice that was made."). In this instance, the SBA's failure to assess evidentiary proof supporting AC Linen's selection of NAICS Code 72 as an entity providing hotel management services (not as a "hotel" or "restaurant") illustrates that there is no rational connection with the facts articulated and the decision to deny loan forgiveness. Defendants' post-hoc rationalizations in this appeal have no impact on this deficiency. *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 37 F.4th 746, 761 (1st Cir. 2022) ("[A]n agency must stand by the reasons it provided at the time of its decision and cannot rely on post-hoc rationalizations developed and presented during litigation"); *see also Christ the King Manor*, 730 F.3d 291 (stating that a court's review must "be based on 'the administrative record [that was] already in existence' before the agency, not 'some new record made initially in the reviewing court' or 'post-hoc rationalizations' made after the disputed action.") (citation omitted). Viewing

18

these flaws in totality commands a finding that the reasons supporting the FLRD are arbitrary and capricious, thereby warranting a reversal of the SBA's decision to deny loan forgiveness.

Further underscoring the FLRD deficiencies is Defendants' concession that the SBA failed to provide sources and citations for the assertion that "ETRAN, Secretary of State and Borrowers website confirms the entities are Linen Supply Service companies." *See* Cross-Motion, 31. Defendants downplay the impact of this omission, arguing that the SBA's decision can be "'reasonably discerned' despite the lack of citations for these sources." *See id*. at 32. Yet "[t]he agency must explain the evidence which is available, and must offer a rational connection between the facts found and the choice made." *Nat'l Tr. for Historic Pres. v. Buttigieg*, 125 F.4th 278, 284 (1st Cir. 2025) (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52; *see also Gailius v. I.N.S.*, 147 F.3d 34, 47 (1st Cir. 1998) ("a reviewing court cannot sustain the agency's decision [if] it has failed to offer legally sufficient reasons for its decision"). If the information the SBA used to support its reasoning is not part of the record, there is no way to discern any connection between the SBA's factual findings and the denial decision. Rather than "stand by the reasons it provided at the time of its decision," the SBA seems to be backtracking on these previously cited sources. *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 37 F.4th at 761 ("[A]n agency must stand by the reasons it provided at the time of its decision . . . . "). Accordingly, this Court should determine that the SBA's FLRD is arbitrary and capricious, and its determination was an error in judgment to be held unlawful and set aside.

**<u>CONCLUSION</u>**

In light of the foregoing, AC Linen respectfully requests that this Court hold unlawful and set aside the SBA's determination that it was not eligible for a Second Draw Paycheck Protection Program Loan, rule that the SBA's denial decision violates the Administrative Procedure Act and grant all other just and proper relief.

19

Dated: March 10, 2026

Respectfully submitted,

DENTONS US LLP

*/s/ Melissa Sarsten Polito*
Melissa Sarsten Polito